UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PEARL HENYARD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:15-CV-10835 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MV TRANSPORTATION and PACE | ) | |
| SURBUBAN BUS SERVICE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pearl Henyard brings this *pro se*[1] lawsuit against her former employer, MV Transportation, Inc., and its client, Pace Suburban Bus Service.[2] There are two remaining claims in this action: a hostile work environment claim under Title VII, 42 U.S.C. 2000e *et seq.*, and an Illinois statutory eavesdropping claim, 720 ILCS 5/14-2(a)(1). The Defendants move for summary judgment on the remaining claims. R. 132.[3] For the reasons explained below, the motion is granted.

---

[1]After Henyard brought the case without attorney representation, the Court recruited *pro bono* counsel for her, but Henyard fell out of communication. R. 6, 7, 40. After re-appearing, a disagreement between counsel and Henyard prompted the Court to recruit new counsel. R. 60, 66. But this representation too did not work out, R. 71, with Henyard terminating the representation, R. 75.

[2]This Court has federal question jurisdiction over the Title VII claim under 28 U.S.C. § 1331, and supplemental jurisdiction under the state law claim under 28 U.S.C. § 1367.

[3]Citations to the record are noted as "R." followed by the docket number, and when necessary, the page or paragraph number.

## I. Background

The facts narrated below are undisputed unless otherwise noted, in which case the evidence is viewed in Henyard's favor because she is the non-movant.[4] MV provides paratransit services in partnership with local government transit agencies, school districts, universities, and corporations. DSOF ¶ 2. MV contracts with Pace to provide paratransit services in the Chicago metropolitan area. *Id.* ¶ 4. Henyard started working with MV as a driver in 2014. *Id.* ¶ 6.[5] Henyard's last day at MV was August 4, 2015, when she was involved in an on-the-job traffic accident. *Id.* ¶ 11. Although she was cleared to return on November 24, 2015, Henyard never went back to work. *Id.* ¶ 12. MV notified Henyard that if it did not hear from her in one month (by December 23), MV would consider her inaction as a voluntary resignation. PSOF ¶ 12. But she did not return and her employment with MC ended. DSOF ¶ 12.

### A. Hostile Work Environment

Henyard's claim for hostile work environment arises out of incidents involving two colleagues: coworker Alicia Greene and supervisor Jaricho Worthy. Henyard alleges that Greene touched her rear end on one occasion with a piece of paper. DSOF

---

[4]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 131]; "PSOF" for Henyard's Statement of Additional Facts [R. 145]; and "Def. Resp. PSOF" for Defendants' response to Henyard's Statement of Additional Facts [R. 153]. Henyard's Additional Statement of Facts, R. 145, is formatted as a response to Defendants' Rule 56 Statement, R.131. But for purposes of this Opinion, the Court will identify R. 145 as "PSOF."

[5]Several times throughout Henyard's Rule 56 statement, R. 145, Henyard says that she disputes the Defendants' particular statement of fact—but her explanation then does not actually deny, at least not entirely, the actual substance of the defense's statement. For failing to comply with Local Rule 56.1 in those instances, the Court will treat those facts as undisputed.

¶¶ 17, 19; R. 131-2, DSOF, Exh. 2, Henyard Dep. at 49:18-24. Henyard also alleges that Greene would proposition her by saying "you're a cute chocolate girl," "you missed me," and "you like me." PSOF ¶ 19. According to Henyard, Greene would also laugh during their encounters. *Id.* After a couple of months, Henyard eventually made a complaint within the company and had no further contact with Greene. *Id.* ¶ 24; Henyard Dep. at 54:8-22.

With regard to supervisor Jaricho Worthy, Henyard first asserts that Worthy caused her holiday pay to be delayed when she took time off in late 2014 and early 2015. R. 80, Am. Compl. ¶¶ 11, 22; PSOF ¶ 20. In December 2014 or January 2015, Henyard complained to an employee in the payroll department about the non-payment. R. 146, Henyard Decl. ¶ 47. Second, according to Henyard, Worthy did not want to approve time off for doctor's appointments.[6] PSOF ¶ 20. Third, after an accident involving two pedestrians, Worthy fabricated a story about a young boy being struck in a Burger King parking lot. Henyard Decl. ¶ 39; Henyard Dep. at 62:9-20. But Henyard was not involved in the accident. DSOF ¶ 21. Worthy required both male and female drivers, including Henyard, to sign a document on a clipboard about the incident as part of some protocol. PSOF ¶ 21. Lastly, on one occasion, Worthy pulled on Henyard's scarf as she was walking by. Henyard Dep. at 65:6-66:3. Although the record is unclear about when the clipboard incident and the scarf incident happened, Henyard testified in her deposition that they happened on the same day. *Id.* 91:9-12.

---

[6]It appears that eventually, Henyard received her holiday pay and approval for leave. *See* Henyard Decl. ¶ 38; Henyard Dep. at 61:19-21; 67:1-5; Am. Compl. ¶¶ 11-12, 22; R. 148, Pl. Resp. Br. at 56.

3

In any event, according to Henyard, in July 2015, she reported Worthy to the union representative, at which point she and Worthy had no further communication. Henyard Decl. ¶¶48-49; PSOF ¶ 26.

### B. DriveCam

The eavesdropping claim arises out of a video system called DriveCam. Each MV vehicle is equipped with a DriveCam device which records audio and video of the driver. DSOF ¶ 7. The camera is positioned to record both the road ahead and the inside of the vehicle. *Id*. All MV drivers receive training on the DriveCam device. *Id*. ¶ 8. In a sworn declaration, MV General Manager Jesus Valenzuela averred that the DriveCam starts recording only when triggered by one of two events: (1) the driver turns on the recording function manually; or (2) vehicular impact starts the recording function automatically. R. 131-1, DSOF, Exh. 1, Valenzuela Decl. ¶ 8. According to Valenzuela, when the recording function is triggered (by either of the two ways), the recording captures only the 10 seconds preceding and the 10 seconds following the triggering event. *Id*. ¶ 9.

Henyard does not dispute that she consented to being recorded when triggering events happened. Henyard Decl. ¶ 87. She does contend, however, that the DriveCam actually records vehicle operators "from the time the operator starts work and ends work." *Id*. ¶ 79. Henyard believes that MV was recording her "throughout the duration of employment" from "the first day of employment until the last day." *Id*. ¶¶ 88-90.

4

The DriveCam is equipped with a red and green light. *Id.* ¶ 92. Henyard has observed these lights flashing "sometimes red, or green," or even both red and green at the same time. *Id.* According to Henyard, employees "were not informed of the representation of both green and red lights on at the same time." *Id.* During training, Henyard contends, drivers were told that "they will be recorded 10 seconds before and 10 seconds afterwards when the green light turns red and flashes, if the light is already red, it will flash for recording when the camera is hit manually or if there is a shift." *Id.* ¶ 93. But according to Henyard, she saw the camera "do things" contrary to what she was told during training. Henyard Dep. at 41:3-4. She testified in her deposition that, on certain days, the camera would "shift from red back to green" and that the camera would flash green upon her starting the vehicle. *Id.* at 41:6-20. On other days, Henyard observed the camera shift from green to red upon a vehicular jerk and stay red for the rest of the day. *Id.* at 42:3-13.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372,

378 (2007) (cleaned up).[7] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Before discussing the two remaining claims, it is worth noting that, throughout the response brief, Henyard attempts to re-litigate claims that the Court previously dismissed. *See generally* R. 148, Pl. Resp. Br.; R. 102. There is no need to address those already-dismissed claims, so the Court moves on to the claims for hostile work environment and for eavesdropping.[8]

---

[7]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

[8]Henyard's motions to file a sur-reply and its related extra briefing, R. 154, 155, 159, are denied. Henyard had ample time to file the response brief; the defense's opening brief was filed on February 11, 2020, R. 132, and Henyard eventually responded on June 22, 2020, R. 148. And the Defendants did not add anything new in the reply briefing and Local Rule 56.1 response that would justify a sur-reply to either filing.

## A. Hostile Work Environment

To survive summary judgment on the hostile work environment claim, Henyard must offer enough evidence, viewed in her favor, that would allow a reasonable jury to find that (1) she was subject to unwelcome harassment; (2) the harassment was based on membership in a protected class; (3) the harassment was severe or pervasive enough so as to alter the conditions of employment and create a hostile work environment; and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015).

The Defendants' arguments against the hostile work environment claim are as follows: (1) Henyard waited two months to report Greene's conduct, and when she did, MV took action to remedy the problem; (2) Henyard's subjective belief that Worthy did not want to approve her holiday pay or her time off for doctor's appointments are insufficient because she eventually received both the holiday pay and the approval; (3) Henyard failed to show that being required to sign the document about the accident was based on her sex; (4) Worthy's pulling on her scarf was neither severe nor pervasive enough to have created a hostile work environment; and (5) Henyard provides no evidence that the conditions of her employment were changed. *See* R. 133, Def. Br. at 2–5.

### 1. Coworker Liability

The first two arguments challenge the basis for employer liability. First up are the incidents related to Alicia Greene, who was Henyard's coworker. The standard for a hostile work environment claim based on *coworker* conduct (as distinct from a

7

supervisor) is a negligence standard: "if only coworkers were culpable for making a work environment hostile, the plaintiff must show that the employer has been negligent either in discovering or remedying the harassment." *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (cleaned up), *aff'd*, 570 U.S. 421 (2013). An employer can avoid liability for coworker harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring. *Porter v. Erie Foods Int'l, Inc.,* 576 F.3d 629, 636 (7th Cir. 2009). An employer does not even have to successfully remedy the harassment to avoid liability, so long as the corrective action was prompt and reasonably likely to prevent reoccurrence. *See id.*; *Vance*, 646 F.3d at 471 (employer satisfied obligations under Title VII even though corrective measures did not ultimately persuade coworkers to treat plaintiff with respect). Here, Henyard concedes that she took a couple of months before complaining to MV about Greene. Henyard Dep. at 54:4-22. And after she complained, the two had no further communication. Henyard Decl. ¶ 36. In fact, when Henyard concedes that she herself told Greene to stop touching her, and Greene stopped. Henyard Decl. ¶ 32. Although the record is not crystal clear on what MV did to effectuate the separation, Henyard must provide evidence that MV failed to take prompt and appropriate corrective action. There is no evidence like that: after the complaint to MV, she had no contact with Greene. Without a showing of negligence, the hostile work environment claim premised on Greene cannot survive.

### 2. Supervisor Liability

Moving on to the incidents involving Worthy, it is easier for a plaintiff to prevail on employer liability for a supervisor's misconduct, but the evidence falls short here. It is true that employers are held strictly liable for a supervisor's misconduct if the harassment resulted in a tangible employment action, such as a discharge, demotion, change in work conditions, or a significant change in benefits. *Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Here, at most, Worthy merely caused relatively short delays in Henyard's receipt of holiday pay and in approval for time off. Am. Compl. ¶¶ 11-12, 22; Henyard Decl. ¶ 38; Henyard Dep. at 61:19-21; 67:1-5. Relatively minor hindrances in receiving benefits typically do not amount to tangible employment action. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (occasional denial of leave requests, even when combined with other inconveniences, did not materially alter the conditions of employment). Based on the record evidence, and even viewing the evidence in Henyard's favor, she did not suffer a tangible employment action. So there is no basis for strict liability against MV.

### 3. Sex-based Harassment

Even if there was some basis for strict liability for Worthy's conduct, there is an independent, fatal deficiency with Henyard's claim: no reasonable jury could find that the conduct was based on sex. For example, the Defendants correctly point out that, even on Henyard's telling, both male and female employees were required to

sign the document on the clipboard after the accident involving two pedestrians. Henyard Decl. ¶ 40. Henyard concedes this. *Id.* And nothing else about what Worthy was alleged to have done in creating a hostile environment would support a finding that the conduct was based on Henyard's sex. This alone warrants summary judgment against the hostile work environment claim arising from any conduct attributed to Worthy.

### 4. Severe or Pervasive

As another independent basis against the claim premised on Worthy's conduct, no jury could reasonably find that the conduct was severe or pervasive enough to create a hostile work environment. *See Huri*, 804 F.3d at 833-34. "In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (cleaned up) "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (cleaned up). Worthy pulled on Henyard's scarf only once, Henyard Dep. at 65:2-66:21; Henyard alleges that Worthy only *delayed* the benefits that she ultimately re-

ceived, Am. Compl. ¶¶ 11-12, 22; communications with Worthy stopped after she complained, Henyard Decl. ¶49; and Henyard concedes that she left MV for reasons unrelated to Worthy. *Id.* ¶ 78.

Even viewed cumulatively, these incidents involving Worthy do not amount to severe or pervasive harassment. The governing case law sets too high a bar for Henyard to meet. For example, in *Adusumilli v. City of Chiago*, the severe-or-pervasive standard was not met despite several instances of misconduct committed by multiple colleagues. 164 F.3d at 361-62. There, the employee suffered the unwanted touching of the buttocks on one occasion, four other touching incidents, and several other off-color comments. *Id.* The Seventh Circuit nonetheless held that these incidents were too isolated to establish a hostile work environment claim. *Id.* at 362. The incidents that Henyard allege, even in their totality, are no more severe or pervasive. The summary judgment record does not allow a juror to establish that the Defendants created a hostile work environment claim.

This applies also to the other alleged misconduct. Although Henyard asserts that she received fewer responsibilities and that her routes were changed, Henyard Decl. ¶ 74; Pl. Resp. Br. at 20, 38, she does not offer evidence to show how this related to sexual harassment. Indeed, these assertions appear to be remnants of her retaliation claims that were previously dismissed. *See* Am. Compl. ¶15, R. 102, at 14-15. On the termination of her employment, Henyard eventually left MV at the end of 2015, but she provides no evidence that she left as a result of the alleged conduct. In fact, Henyard acknowledges that she stopped coming to work because of injuries sustained

11

in an on-the job accident. Henyard. Decl. ¶ 78. Furthermore, any delays in receiving benefits were eventually remedied. Am. Compl. ¶¶ 11-12, 22; Henyard Decl. ¶ 38; Henyard Dep. at 61:19-21; 67:1-5. All in all, Henyard lacks evidence showing that the alleged conduct materially changed the conditions of her employment. For all these reasons, summary judgment is granted against the hostile work environment claim.

## B. Eavesdropping

Next, the Defendants argue that Henyard has insufficient evidence to allow a jury to find that they knowingly and intentionally recorded her without her consent. Def. Br. at 5. The Illinois Eavesdropping Act prohibits a person from knowingly and intentionally using "an eavesdropping device, in a surreptitious manner, for the purpose of overhearing, transmitting, or recording all or any part of any private conversation to which he or she is not a party unless he or she does so with the consent of all the parties to the private conversation." 720 ILCS 5/14-2(a)(1). The evidence offered by Henyard is insufficient for a jury finding on several statutory elements.

### 1. Private Conversation

First, the record is devoid of evidence that Henyard was partaking in any private conversation recorded by the DriveCam. The eavesdropping statute prohibits the "overhearing, transmitting, or recording" of any "*private* conversation." 720 ILCS 5/14-2(a)(1) (emphasis added). An eavesdropping device is "any device capable of being used to hear or record *oral conversation*." 720 ILCS 5/14-1(a) (emphasis added). The statute further defines "private conversation" as "any *oral communication* between 2 or more persons regardless of whether one or more of the parties intended

12

their communication to be of a private nature under circumstances justifying that expectation." 720 ILCS 5/14-1(d)(emphasis added). Henyard only alleges that she was "recorded via/audio on work vehicles." Am. Compl. ¶¶ 16, 24. And aside from a generalized statement—so general as to lack foundation for admissibility—in Henyard's deposition that the DriveCam was recording "all your conversation," Henyard Dep. 43:24, there is no evidence that she was engaged in any *private* conversations while driving for MV. Nor is there evidence that Henyard would take personal phone calls on the road. All in all, Henyard has failed to provide any factual specifics on the nature, timing, or duration of any private conversations, so this element cannot be found by a jury.

### 2. Knowledge and Intent

Second, Henyard does not offer any evidence establishing the knowledge and intent requirement. Henyard contends that the DriveCam continuously recorded her throughout the course of her employment. Henyard Decl. ¶¶ 86, 89-90. She has not, however, seen or heard any of the alleged recordings. *Id.* ¶¶ 82, 96. Although Henyard claims to have documentation of unconsented recordings, none of it is in the record.[9] *Id.* ¶ 84. Thus, Henyard is left with her sworn statement about the red and green lights. *Id.* ¶ 92. According to Henyard, the lights would change without a triggering event: "DriveCam lights are sometimes red, or green" and "there have been times where there have been both red and green lights at the same time." *Id.* Even if that

---

[9]Throughout her declaration, Henyard cites to several exhibits that are neither attached nor otherwise submitted as part of the summary judgment record. The only exhibits attached to her declaration are excerpts from her deposition transcript and from her first set of answers to Defendants' first set of interrogatories. *See* R. 146 at 18-67.

13

assertion is assumed to be true, the mysterious lights are not enough to infer MV's *knowledge* or *intent* to make unauthorized recordings. That would be a speculative leap that takes reasonable inferences too far. The state-of-mind element is not met.

### 3. Surreptitious

Lastly, Henyard offers little evidence that the device was used in a "surreptitious manner," as required by Illinois law. The eavesdropping statute defines surreptitious as "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g). Henyard's very awareness of the purportedly erratic lights would refute that the alleged recordings were made by stealth or by concealment. It is true that, under Henyard's version of events, the drivers did not consent to recordings beyond the two types of triggering events. But if the recording lights visibly turned on for the drivers to see, then no reasonable jury could find that MV made the recordings in a surreptitious manner. For the failure on these three statutory elements—even one failure would be enough to undermine the claim—the eavesdropping claim is dismissed.

### C. Discovery

Throughout her summary judgment briefing, Henyard argues that she is entitled to more discovery. *See generally* Pl. Resp. That is wrong. Discovery closed on November 18, 2019. R. 110. On December 9, 2019, Henyard moved to extend discovery, but the request was denied because she presented "no good-cause explanation for why she is only now pursuing this discovery" when the case has "been pending for an extensive time." R. 127. Like before, Henyard still fails to explain what good cause

there is to re-open discovery, especially after the ample time for discovery and after summary judgment briefing. Henyard's request to reopen discovery is denied.

### IV. Conclusion

The Defendants' motion for summary judgment is granted in full. The tracking status hearing of December 4, 2020 is vacated, and the Court will enter final judgment.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 29, 2020